UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 03-34723 |
| | ) | | |
| DAWN LYON, | ) | CHAPTER | 7 |
| | ) | | |
| DEBTOR. | ) | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | | |
|---|---|---|---|
| THOMAS J. MAY, | ) | ADV. PRO. NO. | 03-3212 |
| | ) | | |
| PLAINTIFF | ) | DOC. I.D. NO. | 1 |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| DAWN LYON, | ) | | |
| | ) | | |
| DEFENDANT. | ) | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**APPEARANCES**

Thomas J. May                                    *Pro Se* Plaintiff
Inmate #266732
Osborn Correctional Institution
335 Bilton Road, P.O. Box 100
Somers, CT 06071


Russell Gary Small                              Attorney for Defendant
Law Office of Russell Small
135 Elm Street
Bridgeport, CT 06604

**MEMORANDUM OF DECISION**

Lorraine Murphy Weil, United States Bankruptcy Judge


The matter before the court is the above-referenced plaintiff's (the "Plaintiff") complaint

seeking a determination that a certain judgment debt (the "Debt") owing to the Plaintiff was not

discharged in this chapter 7 case pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4).[1]  This matter

is a core proceeding within the purview of 28 U.S.C. § 157(b).  The court has jurisdiction over this

adversary proceeding pursuant to 28 U.S.C. § 1334 and that certain order dated September 21, 1984

of the District Court (Daly, C.J.).[2]  This memorandum constitutes the findings of fact and

conclusions of law mandated by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.    PROCEDURAL BACKGROUND

### A.    The Chapter 7 Case

The above-referenced debtor/defendant (the "Debtor") commenced this chapter 7 case by

voluntary petition (Case Doc. I.D. No. 1, the "Petition") filed on September 19, 2003.[3]  The Petition

was filed in conjunction with a complete set of schedules (the "Schedules") and a statement of

financial affairs (the "SOFA").  (*See* Case Doc. I.D. No. 1.)[4]  Schedule A (Real Property) shows a

real property asset (the Debtor's residence, the "Residence")[5] of the Debtor with the stated value of

---

[1]        References herein to title 11 of the United States Code or to the Bankruptcy Code are references to the foregoing as they existed prior to amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

[2]        That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceedings . . . arising under Title 11, U.S.C. . . . ."

[3]        Citations herein to the docket of the above-captioned chapter 7 case appear in the following form: "Case Doc. I.D. No. ___."  Citations herein to the docket of this adversary proceeding appear in the following form: "A.P. Doc. I.D. No. ___."

[4]        The Petition, Schedules and SOFA are dated July 31, 2003 on their face.  Those documents were "filled out" by the Debtor's sister pursuant to a power of attorney.  (7/21/05 Transcript (as hereafter defined) at 288 (testimony of the Debtor).)

[5]        Taking judicial notice of the website (www.jud.ct.gov, the "State Website") for the State of Connecticut Judicial Branch, the court notes that the Residence is in foreclosure proceedings and that a judgment of strict foreclosure was entered in those proceedings on February 6, 2006, an execution of ejectment was issued on March 28, 2006 and the execution was returned on May 1,

- 2 -

$140,000.00. Schedule B (Personal Property) totaled the value of the Debtor's personal property at $7,173.00, including an "IRA" valued at $1,000.00 (the "Third IRA"); 1 share of "AGR A" stock valued at $3.00; 35 shares of "AGR B" stock valued at $98.00; and 135 shares of "LU" stock valued at $259.00 (all stock, collectively, the "Stock").[6]  Schedule D (Creditors Holding Secured Claims) totaled the Debtor's secured claims (two mortgages on the Residence) at $119,173.00.  Schedule E (Creditors Holding Unsecured Priority Claims) shows no unsecured priority claims.  Schedule F (Creditors Holding Unsecured Nonpriority Claims) totaled the Debtor's unsecured nonpriority claims at $18,956.00.  The Debt was not reflected on Schedule F.  Schedule I (Current Income of Individual Debtor(s)) stated the Debtor's current net monthly income at $2,032.00[7] while Schedule J (Current Expenditures of Individual Debtor(s)) stated the Debtor's current monthly expenses at $3,109.00.  Schedule C (Property Claims as Exempt) claimed various property as exempt under Bankruptcy Code § 522(d) including, among other property, the Residence, the Third IRA and the Stock.  However, the Debtor's response to item 14 of the SOFA ("List all property owned by another person that the debtor holds or controls.") was that the Stock and the Third IRA were owned by the Plaintiff.

The meeting of creditors pursuant to Bankruptcy Code § 341 was scheduled for October 23, 2003 (*see* Case Doc. I.D. No. 2) and December 22, 2003 was set as the last date for filing complaints for determinations of nondischargeability under Bankruptcy Code § 523 (*see* Case Doc. I.D. No. 2).

---

2006. (*See* docket for *C.H.F.A. v. Dawn Lyon*, *et. al.*, NNH-CV-03-0473615-S.)

[6]    "LU" refers to stock in Lucent Technologies Inc. ("Lucent").  "AGR A" and "AGR B" refer to class A and class B stock in Agere Systems Inc. which was "spun off" by Lucent in 2002 to its stockholders.

[7]    Schedule I also states that, as of the Petition date, the Debtor was a single mother of a nine year old daughter.

The Section 341 meeting was held as scheduled.  The chapter 7 trustee filed a report of no

distribution on October 30, 2003.  (*See* Case Doc. I.D. No. 5.)  On October 31, 2003, the Debtor filed

an amended Schedule F.  (*See* Case Doc. I.D. No. 6, "Amended Schedule F.")  Amended Schedule

F added the Debt as a "disputed" unsecured, nonpriority debt in the amount of $13,200.00 with the

notation: "money lent judgement [sic] as of 4/99."[8]  On the same date, the Debtor filed an amended

SOFA.  (*See* Case Doc. I.D. No. 7, the "Amended SOFA.")  The Amended SOFA was substantially

identical to the SOFA except that the Amended SOFA stated the aggregate value of the Stock and

Third IRA at $1,000.00 (where the SOFA did not state a value).  (*See* Case Doc. I.D. No. 7.)  The

Debtor received a chapter 7 discharge in this case on January 12, 2004.  (*See* Case Doc. I.D. No. 9.)

### B.   The Adversary Proceeding

The Plaintiff commenced this adversary proceeding by a complaint (A.P.  Doc. I.D. No. 1,

the "Complaint") filed on December 18, 2003.[9]  The Complaint alleges in pertinent part as follows:

. . .

6.   Thomas J. May is a creditor of the Debtor with claims in excess of
$25,012.77.  Thomas J. May's claims against the Debtor are evidenced by:
[sic]

7.   On or about December 14, 1998, Thomas J. May gave the Debtor power of
attorney in regard to his financial affairs.

---

[8]   The subject judgment actually was dated September 4, 2003 and was in the amount
of $25,012.77.  (*See* part II, *infra*.)  The Debtor claims to have been unaware of the judgment for
some time after it was entered.  (*See* 3/14/05 Transcript (as hereafter defined) at 87, 88-89 (testimony
of the Debtor).)

[9]   As noted above, the Plaintiff is *pro se* in this adversary proceeding.  However, the
Plaintiff, who is incarcerated (see below), has had the assistance of the Inmates' Legal Assistance
Program in preparing his pleadings and briefs.

8. Thomas J. May's family gave the Debtor a total of $13,200 to invest for Thomas J. May. The Debtor spent some or all of the money for her own personal uses.

9. Thomas J. May's veteran's disability checks were deposited directly into an account maintained by Thomas J. May at American Savings Bank.

10. The Debtor used her power of attorney to withdraw the money from the veteran's disability checks from Thomas J. May's account. She spent the money on her own personal uses.

11. On July 3, 2002, Thomas J. May filed suit against the Debtor in the Connecticut Superior Court for the Judicial District of Hartford.

12. On September 4, 2003, the Court (Shapiro, J.) entered judgment in favor of Thomas J. May in the principal amount of $18,200, plus $6,812.77 in interest, for a total of $25,012.77.

### IV. Count I: Violation of 11 USC § 523(a)(2)(A)

. . .

14. The Debtor, through false pretenses, false representations, and/or actual fraud acted to induce Thomas J. May to enter into agreements for valuable consideration, and in the absence of the said false pretenses, false representations, and/or actual fraud by the Debtor, Thomas J. May would not have entered into the agreements and incurred the losses attributable to the Debtor.

15. The Debtor's conduct violates 11 USC § 523(a)(2) and, therefore, the Debtor's indebtedness to Thomas J. May constitutes a nondischargeable debt.

### V. Count II: Violation of 11 USC § 523(a)(4)

. . .

17. The Debtor engaged in fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny, and in the absence of said fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny, Thomas J. May would not have incurred the losses attributable to the Debtor.

18. Such conduct violates 11 USC § 523(a)(4) and, therefore, the Debtor's indebtedness to Thomas J. May constitutes a nondischargeable debt.

(A.P. Doc. I.D. No. 1.) The Debtor filed her answer on April 19, 2004. (*See* A.P. Doc. I.D. No. 48.)

*Inter alia*, that answer denied paragraphs 8, 10, 14, 15, 17 and 18 of the Complaint and pleaded

insufficient knowledge with respect to paragraphs 6, 7 and 9 of the Complaint.

The matter came on for a three-day trial (the "Trial") on March 14, 2005, June 23, 2005 and

July 21, 2005.[10] At the Trial, the Plaintiff, his father, the Debtor and Mr. Steven Mills testified for

the Plaintiff and the Debtor also testified for herself. At the conclusion of the Plaintiff's case in

chief, the Debtor moved to dismiss the Complaint. (*See* 6/23/05 Transcript at 240.) That motion

was denied. (*See id.*) Both the Plaintiff and the Debtor introduced documentary evidence into the

record.[11] At the conclusion of the Trial, the court set a briefing schedule and took the matter under

advisement (pending briefing). The matter now has been fully briefed and is ripe for decision.

## II.  FACTS[12]

At the time of Trial, the Debtor had been employed by Cuno Incorporated for fifteen years.

She has held the title of Credit Manager since 2000; prior to then she was the Assistant Credit

---

[10]  The Plaintiff appeared at the Trial pursuant to multiple writs of habeas corpus ad testificandum. A transcript of each day's proceedings is in the record of this proceeding as A.P. Doc. I.D. Nos. 121 (March 14, 2005), 122 (June 23, 2005) and 123 (July 21, 2005). References herein to any such transcript are in the following form: "__/__/05 Transcript at ___:___."

[11]  References herein to those exhibits appear in the following form: "Plaintiff's Exh. __" or "Debtor's Exh. __" (as the case may be). Plaintiff's Exhibits O, P and W are composed of documents produced in discovery by the Debtor. Exhibit P is comprised of statements with respect to the NDB Account (as hereafter defined) from February 23, 1999 through November 30, 2001. Hand written notes on Plaintiff's Exhibit P were made by the Debtor. At the Trial, the court admitted Exhibit P into evidence subject to a determination of relevance. (*See* 3/14/05 Transcript at 57.) The court hereby deems Exhibit P to be relevant and it is admitted into evidence as a full exhibit.

[12]  The facts set forth immediately below and elsewhere in this opinion have been gleaned from the record of this adversary proceeding and the entire record of this chapter 7 case.

Manager. (3/14/05 Transcript at 17 (testimony of the Debtor).) The Debtor has "[k]nowledge of a financial statement" and "[b]asic accounting skills." (3/14/05 Transcript at 18:2-4 (testimony of the Debtor).) She is not an investment expert or professional. (*See* 3/14/05 Transcript at 18 (testimony of the Debtor; 6/23/05 Transcript at 230 (testimony of the Plaintiff); *id.* at 259 (testimony of the Debtor).) The Debtor is about 45 years old and the Plaintiff is about 50 years old. (6/23/05 Transcript at 245; Debtor's Exh. 19.) The Debtor first met the Plaintiff in October of 1989. (6/23/05 Transcript at 242 (testimony of the Debtor).) They started dating and moved in together in January of 1990. (*Id.*) The relationship ended at the end of the summer of 1990 and the Plaintiff moved out. (*Id.* at 243.) The Debtor rarely saw the Plaintiff thereafter but for the next "couple of years" the Plaintiff's son would visit her during the summer. (*Id.* at 243:15.)

In 1998, a co-worker brought a newspaper article to the Debtor's attention which reported that the Plaintiff had been shot. (*Id.* at 244 (testimony of the Debtor).) The Plaintiff then was in the middle of divorce proceedings with his wife. (6/23/05 Transcript at 200.) He was shot in the course of his armed attack upon her. (*Id.*) The Debtor called the Plaintiff's mother to see how he was. (*Id.* at 244.) The Plaintiff's mother called the Debtor back to tell her that the Plaintiff would like to hear from her and gave the Debtor the information to write to him. (*Id.*) The Debtor began corresponding with the Plaintiff approximately at the end of September, 1998 or the beginning of October, 1998. (*Id.* at 244-45.) When the Debtor first began corresponding with the Plaintiff, he was in the hospital; for the rest of the time he was at a correctional facility. (*Id.* at 244.)

During the Debtor's incarceration, the Debtor visited him "as often as possible" until March 24, 2001. (*Id.* at 245:24 (testimony of the Debtor).) During the period from March 17, 1999 through March 24, 2001, the Debtor visited the Plaintiff at the correctional facility thirty-seven times. (*See*

Plaintiff's Exh. O.)  Sometimes the Debtor's young daughter accompanied her.  (*See* 6/23/05

Transcript at 209 (testimony of the Plaintiff).)  During the period from January of 1998 to March

2000, the Plaintiff wrote the Debtor approximately one hundred fifty letters.  (*See* Debtor's Exh. 6.)

The Debtor saved those letters to her.  (3/14/05 Transcript at 21 (testimony of the Debtor).)

However, the Plaintiff's letters to the Debtor dated after March 24, 2000 got lost in a move (except

for one certified letter returned to the Plaintiff as undelivered (Plaintiff's Exh. M)).  (3/14/05

Transcript at 23 (testimony of the Debtor); 6/23/05 Transcript at 255-56 (testimony of the Debtor).)

The Debtor frequently responded to those letters.  (*See id.*)  Except for one letter dated May 31, 2001

(Plaintiff's Exh. N), the Plaintiff does not appear to have saved the Debtor's letters to him.  The

Plaintiff also telephoned the Debtor (collect) from time to time.  (*See* 3/14/05 Transcript at 28

(testimony of the Debtor); Debtor's Exh. 6.)

The Plaintiff's divorce from his wife became final on or about September 11, 1998.  (*See*

Plaintiff's Exh. A.)  It appears that all the Plaintiff took away from that marriage was a 1993 Ford

Thunderbird automobile, a 1990 Harley Davidson motorcycle and certain intangible assets (including

a small IRA with Dean Witter (the "First IRA"), an account with American Savings Bank (the "ASB

Account")[13] and his right to receive monthly payments (the "VA Checks") from the Veterans

Administration).  (*See* 6/23/05 Transcript at 184 (testimony of the Plaintiff); Plaintiff's Exh. A;

Plaintiff's Exh. CC.)  The VA Checks were deposited directly into the ASB Account.[14]  From

---

[13]     In or about September, 1998, the Plaintiff's mother became a joint account holder
with her son with respect to the ASB Account.  (*See* 6/23/05 Transcript at 233 (testimony of the
Plaintiff); Plaintiff's Exh. J.)

[14]     (*See* 3/14/05 Transcript at 66 (testimony of the Debtor).)  The Plaintiff generally
received between $182.00 and $188.00 per month in a VA Check until February 29, 2000.  The
Plaintiff received a lump sum payment of $740.00 from the Veterans Administration on October 24,

January 31, 2000 to October 23, 2001, VA Checks in the aggregate amount of $2,328.00 were

deposited into the ASB Account.  (*See* Debtor's Exh. 1; Plaintiff's Exh. J.)  The "opening balance"

in the ASB Account as of January 18, 2000 was $199.00 and there was $138.00 in the account as

of October 23, 2001 (which was paid over to the Plaintiff's parents).  (*See id.*)  Withdrawals by the

Debtor from the ASB Account pursuant to the POA (as defined and discussed below) in the

approximate aggregate amount of $1,800.00 have been questioned by the Plaintiff.  (*See* 6/23/05

Transcript at 167 (testimony of the Plaintiff).)

On or about December 14, 1998, the Plaintiff executed and delivered to the Debtor a

(durable)[15] Statutory Short Form Power of Attorney appointing the Debtor as his attorney-in-fact.

(*See* Plaintiff's Exh. C, the "POA".)[16]  Although the POA was, on its face, a general (rather than a

special) power of attorney, the purpose of the POA was to give the Debtor access to the ASB

Account and a credit card of the Plaintiff.  (*See* 6/23/05 Transcript at 219-220 (testimony of the

Plaintiff).)  The Plaintiff instructed the Debtor to "clear" (*i.e.*, sweep) the ASB Account on a monthly

basis so that only a $5.00 balance remained.  (*See* 3/14/05 Transcript at 67 (testimony of the

Debtor).)  The Plaintiff's purpose with respect to the foregoing was to avoid child support to some

degree and to provide some funds for investing (if he chose) and if he "needed money."  (*See* 6/23/05

---

2000.  Thereafter he received monthly VA Checks in the amount of $98.00.  (*See* Debtor's Exh. 1;
Plaintiff's Exh. J.)

[15]      A durable power of attorney survives the incapacity or incompetence of the grantor.
*See* Conn. Gen. Stat. § 45a-562.  It is unclear which of the parties initiated the idea of the POA.

[16]      The Debtor has challenged whether the POA satisfied the technical requisites for a
statutory power of attorney in that it may have been witnessed by convicted felons.  However, the
Debtor acknowledged her receipt of the same and that she acted pursuant to it.  (*See* 3/14/05
Transcript at 34-35 (testimony of the Debtor).)  In any event, because the determination of the issue
makes no difference to the result here, the court will assume that the POA was valid and effective.

Transcript at 181:18, 183-84 (testimony of the Plaintiff).)  The Debtor "cleared" the ASB Account

more or less as instructed.  She maintained a "register" for the account.  (*See* Debtor's Exh. 1.)

Sometimes the Debtor drew checks on the account to herself and put the proceeds in her account.

Sometimes she wrote checks from the ASB Account to pay for things requested by the Plaintiff or

for her personal expenses.  (*See* 3/14/05 Transcript at 67-68 (testimony of the Debtor); Debtor's Exh.

1.)

By letter dated December 31, 1998, the Plaintiff suggested to the Debtor that she open a

brokers account in her own name to make investments for the Plaintiff.  (*See* Plaintiff's Exh. CC

(letter dated December 31, 1998).)  The Plaintiff's automobile and motorcycle were sold[17] and the

First IRA was liquidated.[18]  As instructed, the Debtor opened a brokerage account with National

Discount Brokers (the "NDB Account")[19] in her own name and the proceeds of the foregoing were

deposited therein.  (*See* 3/14/05 Transcript at 53-54 (testimony of the Debtor).)  The Plaintiff funded

one-half of the cost of a computer in order that the Debtor might trade stocks for him "on line."  (*See*

---

[17]     Title to the motorcycle had been passed to the Plaintiff's father.  Title to the
automobile had been passed to the Plaintiff's brother.  (*See* 6/23/05 Transcript at 220.)  However,
the court finds that the proceeds of those vehicles belonged to the Plaintiff.

[18]     The proceeds of the motorcycle and First IRA were $11,345.89 in the aggregate. (*See*
Debtor's Exh. 2.)  The proceeds from the sale of the automobile were $3,000.00.  (*Id.*)  That yielded
a total of $14,345.89.  The Debtor opened the NDB account on February 23, 1999 with a $10,200.00
deposit.  (*See* Plaintiff's Exh. P (Statement for period 2/22/99 through 2/26/99).)  She deposited an
additional $3,500 on May 24, 1999.  (*See* Plaintiff's Exh. P (Statement for period 5/01/99 through
5/28/99).)  The remaining proceeds were used by the Debtor to pay expenses related to the
liquidation and/or maintenance of the foregoing assets.  (6/23/05 Transcript at 115 (testimony of the
Debtor).)

[19]     From and after January 1, 2002, the NDB account appears to have been converted into
an "Ameritrade Plus" account.  (*See* Plaintiff's Exh. W.)  For the sake of convenience, this opinion
will speak as if there were only one brokerage account for the entire period.

- 10 -

*id.* at 55.)  All trading decisions were made by the Plaintiff and communicated to the Debtor either

through his letters or telephone calls, his family or Mr. Mills.  (*See* 3/14/05 Transcript at 55-56

(testimony of the Debtor); 6/23/05 Transcript at 232 (testimony of the Plaintiff).)  From May, 1999

to June, 2000, the NDB Account showed a high level of trading; trading reached a high of

$227,929.20 bought and sold in the May/June, 2000 timeframe.  (*See* Plaintiff's Exh. P (especially

statement for May/June, 2000).)[20]  Trading ceased after November, 2000.  (*See* Plaintiff's Exh. P.)

Margin transactions began to occur from and after approximately January, 2000.  (*See id.*)[21]  The

Plaintiff appears to have first brought up the subject of the Debtor's opening a margin account with

respect to the NDB Account in a letter dated April 8, 1999.  (*See* Plaintiff's Ex. CC.)  (*See also*

Plaintiff's Exh. JJ (letter dated 4/12/99 mentioning margin account; Plaintiff's Exh. MM (letter dated

10/8/99 suggesting alternative credit arrangement).)  The Debtor was personally liable on the margin

debt.  (*See* 6/23/05 Transcript at 144-45 (testimony of the Debtor).)  Around the middle of June,

2001, 865 shares of Lucent Stock were sold to satisfy margin debt (leaving only 135 shares).  (*See*

Plaintiff's Exh. P (statement for period from 5/26/01 to 6/29/01).)[22]

---

[20]    That does not mean that the value of the Plaintiff's portfolio was ever anything even
near that amount but, rather, that the Plaintiff jumped from stock to stock (*i.e.*, "day traded")
frequently during that month thus generating the high level of "buys" and "sells."  The Plaintiff's
portfolio reached its peak value in June 2000 and was valued at $41,040.29 (including stock bought
"on margin."  (*See* Plaintiff's Exh. P.)

[21]    "A margin account is the securities industry's method of extending credit to
customers; a customer purchases a specified amount of stock from a securities firm by advancing
only a portion of the purchase price, and the firm retains such stock as collateral for the loan and
charges interest on the balance of the purchase price."  12 Am. Jur. 2d *Brokers* § 151 (2006).

[22]    The Debtor bought 1,000 shares of Lucent Stock on or about October 23, 2000 at $22
per share.  (*See* Plaintiff's Exh. P (statement for period 9/30/00 to 10/27/00).)  At the time the Lucent
Stock was sold for margin debt (*i.e.*, mid-June 2001), it was worth between $6.83 and $5.51 per
share.  In the last statement in Plaintiff's Exh. W (for the period 9/27/03 to 10/31/03) the Lucent

- 11 -

Statements for the NDB Account (*i.e.*, Debtor's Exh. P) show the following cash withdrawals and payees, relevant dates and the Debtor's explanation for the withdrawal (if an explanation is given):

| Date | Amount | Payee | Debtor's Explanation |
|------|--------|-------|----------------------|
| 6/21/99 | $1,500 | Hudson United (the Debtor's Account) | "loan" but later repaid (*see* Plaintiff's Exh. P (statement for 5/29/99 to 6/25/99); Debtor's Exh. 2)[23] |
| 7/2/99 7/16/99 7/20/99 | $2,600 | Hudson United (the Debtor's Account) | $2,000 to open another IRA for the Debtor with Wit Capital (the "Second IRA")[24] and $600 as a "loan" to the Debtor (*see* 6/23/05 Transcript at 108 (testimony of the Debtor)) |
| 5/24/00 | $4,668[25] | Debtor | payment of expenses including taxes (*see id.* at 111 (testimony of the Debtor)) |

Stock was valued at $3.20 per share (although some of the decline in value may have been a result of Lucent's 2002 spinoff of Agere Systems Inc. and the related issuance of the "AGR A" and AGR B" Stock.  The Plaintiff claims that he directed the Debtor to put an eight percent "stop loss" direction on the NDB Account.  (*See* 6/23/05 Transcript at 206 (testimony of the Plaintiff).)  (*See also* Plaintiff's Exh. KK (letter dated 11/1/99; *but see* Plaintiff's Exh. LL (letter dated 10/8/99 with conflicting "stop loss" directions).)

[23]     There is an unexplained cash deposit of $2,500.00 in the NDB Account on March 21, 2000.  (*See* Plaintiff's Exh. P (statement for 2/26/00 to 3/31/00).)  In any event, a July 25, 1999 letter from the Plaintiff to the Debtor (at side 3) refers to a $1,500.00 "debt" with respect to "NDB."  (*See* Plaintiff's Exh. CC.)

[24]     The Second IRA appears to have been "[trans]ferred back from Wit" and redeposited in the NDB on September 28, 1999.  (*See* Plaintiff's Exh. P (statement for period 9/25/99 to 10/29/1999).)

[25]     That is probably a "net number."  However, there is no statement for this period in Plaintiff's Exh. P.  Accordingly, the court cannot determine from this record what the "gross" number was.

| Date | Amount | Payee | Debtor's Explanation |
|------|--------|-------|----------------------|
| 6/12/00 | $2,500 | Peoples Savings Bank (the Debtor's Account) | closing costs for the Debtor's purchase of the Residence (*id.* at 154 (testimony of the Debtor)) |
| 10/10/00 10/20/00 | $2,300 | Peoples Savings Bank (the Debtor's Account) | reimbursement to the Debtor (*see* Plaintiff's Exh. P (statement for 9/30/00 to 10/27/00))[26] |
| 10/30/00 | $1,500 | Peoples Savings Bank (the Debtor's Account) | none (does not appear on the Debtor's Exh. 2) |
| 01/02/01 | $1,500 | Peoples Savings Bank (the Debtor's Account) | none (does not appear on the Debtor's Exh. 2) |
| 01/12/01 | $1,000 | Peoples Savings Bank (the Debtor's Account) | purchased Third IRA for the Plaintiff (*see* Debtor's Exh. 2; 6/23/05 Transcript at 124 (testimony of the Debtor)) |

The Debtor reflected the profits and losses from the NDB Account on her own tax returns.  The

Debtor did her taxes "with the stocks" and did her taxes "without the stocks" and the difference was

funded from the account.  (*See* 6/23/05 Transcript at 111, 113 (testimony of the Debtor).)[27]

---

[26]    That transaction does not appear on Debtor's Exh. 2.  Debtor's Exh. 2 is a printout of a "register" in which the Debtor attempted to keep track of the Plaintiff's money in respect of both the ASB Account and the NDB Account.  The term "reimbursement" may be deceptive as that may refer to "reimbursement" for expenses incurred on the Plaintiff's behalf as well as "reimbursement" for certain of the Debtor's own personal expenses.

[27]    Debtor's Exh. 2 shows entries for payment of taxes for the Debtor and (presumably) for the Plaintiff as follows:

| | | | |
|------|------|------|------|
| 3/26/00 | Dawn Lyon - State Tax | 1999 Taxes | 110.00 |
| 3/26/00 | Dawn Lyon - Federal Tax | 1999 Taxes | 285.00 |
| 4/16/00 | Internal Revenue Service | Federal Taxes | 2,633.00 |
| 4/16/00 | CT Dept of Revenue | State Taxes | 1,041.00 |
| | . . . | | |
| 1/25/01 | State Income Tax | | 410.00 |
| 1/25/01 | Federal Income Tax | | 739.00 |

Almost every letter from the Plaintiff to the Debtor asked the Debtor to perform some task for the Plaintiff.  (*See* 6/23/05 Transcript at 226-27 (testimony of the Plaintiff); Debtor's Exh. 6.) In addition to the tasks in respect of the ASB Account and the NDB Account, the Plaintiff asked the Debtor to do the following (among other things): to help him with a grievance against his divorce attorney (*see* 6/23/05 Transcript at 213 (testimony of the Plaintiff)); to help with the sale of the motorcycle and automobile (*see id.* at 204 (testimony of the Plaintiff)); to purchase books and magazines and a newspaper subscription, graph paper, stamps, and packages for his roommates (*see* 6/23/05 Transcript at 238 (testimony of the Plaintiff); Debtor's Exh. 6) and to send him various money orders (*see* Debtor's Exh. 2).  The Debtor was supposed to reimburse herself for expenses so incurred from the Plaintiff's funds.  (*See id.*)  With respect to the ASB Account, the Plaintiff's instructions to the Debtor

> varied.  He said a couple of different things, but his main concern was to clear out the account.  And . . . [the Debtor] was using the money to take care of things that he was asking . . . [her] to do.  Purchase subscriptions and money orders for him.  Presents for his family.  Presents for . . . [herself] and . . . [her] daughter at times, and whatever else was necessary.

(7/21/05 Transcript at 281:18-23 (testimony of the Debtor).)  The Debtor claims that she used funds in the ASB Account for her own personal use only "with permission."  (*Id.* at 281-82 (testimony of the Debtor).)  The Plaintiff instructed the Debtor not to send any account (either the ASB Account or the NDB Account) statements to his place of incarceration for fear that fellow inmates might put

---

. . .

| 4/17/01 | State Income Tax | Pd To State | 583.00 |
| 4/17/01 | Federal Income Tax | Pd To Federal | 2,004.00 |

(Debtor's Exh. 2; *see also* 6/23/05 Transcript at 111-113.)

the information to illicit use.  (*See* 6/23/05 Transcript at 113 (testimony of the Debtor); *id.* at 198

(testimony of the Plaintiff).)

The Plaintiff told the Debtor that he loved her.  (*See* 6/23/05 Transcript at 223 (testimony of

the Plaintiff).)[28]  The Debtor asked the Plaintiff to marry her but the Plaintiff declined.  (*See id.* at

202 (testimony of the Plaintiff).)  He wrote to the Debtor that for the time being he wanted to love

her as a friend.  (*See, e.g.*, Plaintiff's Exh. GG (3/29/99 letter); Plaintiff's Exh. JJ (12/4/99 letter).)

On January 19, 2000 the Plaintiff received an eighteen year prison sentence for his attack on his ex-

wife.[29]

The Debtor frequently has suffered from depression.  (6/23/05 Transcript at 249 (testimony

of the Debtor).)  She was out of work suffering from a major depressive episode from August, 1999

to mid-December, 1999.  (*See id.* at 249-50 (testimony of Debtor); Debtor's Exh. 19.)   In the

beginning of 2001, the Debtor began to have physical problems as well.  (*See* 6/23/05 Transcript at

250 (testimony of the Debtor).)  She had vertigo, problems with her hands and problems with her

sinuses.  (*See id.* at 253 (testimony of the Debtor).)  She had two surgeries on each hand: one on each

hand for carpel tunnel syndrome and one on each hand for "trigger finger."  (*See id.*)  The first such

surgery was in March of 2001; the second in May of 2001.  *(See id.*)  In the beginning of 2002, the

Debtor also broke her ankle and damaged her hip.  (*See id.*)  In early 2001, the Debtor stopped doing

anything but taking care of her daughter and going to work because she felt "overwhelmed,

overloaded."  (*See* 6/23/05 Transcript at 251:20 (testimony of the Debtor).)  The Debtor ceased

---

[28]     The Plaintiff's letters to the Debtor often were sexually explicit.  (*See* Debtor's
Exh. 6.)

[29]     The court takes judicial notice of information on the following website:
www.ctinmateinfo.state.ct.us.  (*See also* 6/23/05 Transcript at 197, 218 (testimony of the Plaintiff).)

contact with the Plaintiff "[b]ecause of things that were going on in my life at the time and health issues and - I lost contact with not just him, but everybody, including my family." (7/21/05 Transcript at 278:20-22 (testimony of the Debtor).) During that period of time, all correspondence and the like the Debtor received "was going [unread] into a box." (6/23/05 Transcript at 251 (testimony of the Debtor).) When the Debtor's sister had not heard from her in a year, around July, 2003 the Debtor's sister "showed up at . . . [the Residence]" and the Debtor "told her about the box, and she said she wanted to take care of things." (*Id.* at 262:1-3 (testimony of the Debtor).) The Debtor gave her sister a power of attorney to facilitate the foregoing. (*See id.* at 261; Debtor's Exh. 21 (Power of Attorney).)

The Debtor last visited the Plaintiff on March 24, 2001 and did not contact him again until May 31, 2001. (*See* Plaintiff's Exh. O.) The Plaintiff was "upset and . . . wondered why [contact had ceased]." (6/23/05 Transcript at 207:25 (testimony of the Plaintiff).) The Debtor wrote the Plaintiff a letter dated May 31, 2001 which stated (in relevant part) as follows:

> Hi. Surprised to hear from me? I have not been intentionally not writing. I have just backed off from everyone and shut everyone out. Although everyone thinks I am just fine cause I don't let on to anyone what I am feeling.
> . . .
> I am truly sorry that I have failed you in so many ways. There is nothing more that I can say except that I am really sorry.

(Plaintiff's Exh. N.) That letter was the Debtor's last contact with the Plaintiff until the Trial.

For some time prior to May 21, 2002, the Plaintiff had been trying to contact the Debtor (both at work and at home, by letters and through family and a friend) to find out what had happened and to get control back over the ASB Account and the NDB Account. (*See* Plaintiff's Exh. M.) On or about October 23, 2001, the Debtor met with the Plaintiff's parents and turned the ASB Account

over to them.  (*See* Debtor's Exh. 1 (entry for 10/23/01); 7/21/05 Transcript at 285 (testimony of the

Debtor).)  The last statement in the record for the NDB Account is for the period September 27, 2003

to October 31, 2003 and shows (a) securities owned worth $554.00 and (b) margin debt of $71.50.

(*See* Plaintiff's Exh. W.)  By a certified letter to the Debtor dated May 21, 2002, the Plaintiff

demanded an accounting from the Debtor with respect to the ASB Account and the NDB Account.

(*See* Plaintiff's Exh. M.)  That letter was returned to the Plaintiff undelivered.  (*See id.*)

On or about September 10, 2002, a complaint (the "State Court Complaint") was returned

to the Hartford Superior Court in a civil action captioned *Thomas J. May v. Dawn Lyon*, CV-02-

0818972-S (the "State Court Action").[30]  On July 3, 2003, the Debtor was defaulted in the State

Court Action for failure to appear.  On September 2, 2003, a hearing in damages was held and

judgment (the "State Court Judgment") was entered against the Debtor in the aggregate amount of

$25,012.77 ($18,200.00 plus $6,812.77 in interest).  (*See* Plaintiff's Exh. G.)

## III.    ANALYSIS

### A.    The Law

"[T]he issue of nondischargeability [is] a matter of federal law governed by the terms of the

Bankruptcy Code."  *Grogan v. Garner*, 498 U.S. 279, 284 (1991).  Bankruptcy Code § 523 sets forth

the exceptions to discharge under the Code and states in relevant part as follows:

> (a)    A discharge under section 727. . . of this title does not discharge an
> individual debtor from any debt —
>
> . . .
>
> (2) for money, property, services, or an extension, renewal, or
> refinancing of credit, to the extent obtained by —

---

[30]    Judicial notice is taken of information available on the State Website with respect to
the State Court Action.

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . .

11 U.S.C.A. § 523(a) (West 2005).  Exceptions to discharge must be strictly construed in favor of the Debtor in order to effectuate the fresh start policy of bankruptcy.  *Rosenblit v. Kron (In re Kron)*, 240 B.R. 164, 165 (Bankr. D. Conn. 1999) (Krechevsky, J.).  The party seeking to establish an exception to the discharge of a debt bears the burden of proof by a preponderance of the evidence. *Grogan*, 498 U.S. 279; *Ramos v. Rivera (In re Rivera)*, 217 B.R. 379, 384 (Bankr. D. Conn. 1998) (Dabrowski, J.).

## 1.    Section 523(a)(2)(A)

Section 523(a)(2) covers "'actual fraud' as well as false pretenses and representations." Alan N. Resnick and Henry J. Sommer, 4 *Collier on Bankruptcy* ¶ 523.08[1][e], at 523-45 (15th ed. rev. 1998).  "Actual fraud, by definition, consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another – something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *Id.*

The elements of fraud under Section 523(a)(2)(A) are "(1) a party made a false representation, (2) the party knew the representation to be false, (3) the representation was made with the intent of deceiving or inducing another to act to his or her detriment, and (4) the other party acted in [justifiable] reliance upon the representation to his or her detriment." *Cooke v. Cooke (In re Cooke)*, 335 B.R. 269, 274-75 (Bankr. D. Conn. 2005) (Shiff, J.).  *See also Kron*, 240 B.R. at 165.

- 18 -

2.    **Section 523(a)(4)**

a.    **Fiduciary Fraud or Defalcation**

Under Connecticut law an attorney-in-fact under a power of attorney is a fiduciary.  *See*

*Brown v. Villano*, 49 Conn. App. 365, 368 (1998) ("The power of attorney created a principal-agent

relationship between . . . [the parties], and agency is a fiduciary relationship.").  Moreover, under

Connecticut law a fiduciary relationship may be "implied in law due to the factual situations

surrounding the transactions and relationships of the parties to each other and to the questioned

transactions." *Taylor v. Mitchell College*, No. 561822, 2002 WL 31758412, at *3 (Conn. Super. Ct.

Nov. 15, 2002).  "In the seminal cases in which [the Connecticut Supreme Court] has recognized the

existence of a fiduciary relationship, the fiduciary was either in a dominant position, thereby creating

a relationship of dependency, or was under a specific duty to act for the benefit of another." *Hi-Ho*

*Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 38 (2000).  For analytical purposes only, the court

will assume (but not decide) that the Debtor was a "fiduciary" under state law.  However, the issue

remains as to whether the Debtor was a "fiduciary" within the purview of Bankruptcy Code §

523(a)(4).

In *The Andy Warhol Foundation for Visual Arts, Inc. v. Hayes* (*In re Hayes*), 183 F.3d 162

(2d. Cir. 1999), the Second Circuit rejected the argument that only trustees of actual or technical

trusts qualified as Section 523(a)(4) "fiduciaries" and held that "certain relationships not constituting

actual [or technical] trusts are within the defalcation exception." *Id.* at 169.  The court in *Andy*

*Warhol* stated that

> [i]t has been clear, at least since [the Bankruptcy Act of] 1841, that the defalcation
> exception is not limited to express trusts, *i.e.*, situations where a trustee is a beneficial
> owner of a res held and managed for a named beneficiary.  Indeed, the act stated as

- 19 -

much in specifying "executor[s], administrator[s], guardian[s] or trustee[s]" and then
adding others "acting in any other fiduciary capacity." Moreover, Section 4 of the
same act provided that "no person should be entitled to a discharge who should
'apply trust funds to his own use.'" This heightened restriction, which applied to the
person rather than the particular debt, indicates that Section 1 applied to a greater
range of persons and debts than trustees and misappropriation of trust funds, because
that Section would otherwise have been superfluous . . . .

*Andy Warhol,* 183 F.3d at 167-68 (citation omitted).

The foregoing does not mean that every state-law fiduciary is a Section 523(a)(4) "fiduciary."

As the Second Circuit explained in *Andy Warhol*:

> Although the precise scope of the defalcation exception is a question of
> federal law, its application frequently turns upon obligations attendant to
> relationships governed by state law. For example, state law can be an important
> factor in determining whether someone acted in a fiduciary capacity under Section
> 523(a)(4). On the other hand, there are federal limits on the ability of state law to
> expand the effects of this provision. *See, e.g., In re Marchiando,* 13 F.3d 1111, 1116
> (7th Cir. 1994) ("If . . . a fiduciary is anyone whom a state calls a fiduciary . . . states
> will have it in their power to deny a fresh start to their debtors by declaring all
> contractual relations fiduciary.") As a general matter, therefore, federal law sets the
> outer boundaries of the defalcation exception, while state law may, through lesser or
> greater regulation of fiduciary obligations, affect the application of the provision.

*Andy Warhol*, 183 F.3d at 166-67 (citations omitted) (modification in original). *Cf. Bast v. Johnson
(In re Johnson)*, 174 B.R. 537, 541 (Bankr. W. D. Mo. 1994) ("[I]f the debtor has a sufficiently
elevated level of fiduciary duty, section 523(a)(4) [defalcation exception] could apply to an agency
relationship.") (internal quotation marks omitted)

Some state-law "fiduciary" relationships are so fraught with the elements of trust and
confidence that they come within the ambit of the Section 523(a)(4) defalcation exception either as
a matter of law or after only a minimal factual inquiry by the bankruptcy court. *See, e.g., Republic
of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 811 (4th Cir. 2001) ("[A]mbassadors are,
by definition, fiduciaries for the country they represent."); *Andy Warhol, supra* (attorney-client

relationship); *LSP Inv. P'ship v. Bennett (In re Bennett)*, 989 F.2d 779, *opinion amended on rehearing by* 1993 WL 268299 (5th Cir. 1993) (managing general partner of limited partnership); *Master-Halco, Inc. v. Picard (In re Picard)*, 339 B.R. 542 (Bankr. D. Conn. 2006) (corporate officer/director). However, other non-bankruptcy "fiduciary" relationships require an analysis of the specifics of the relationship to determine whether the subject relationship falls within the ambit of the defalcation exception. *See, e.g., Texas Lottery Commission v. Tran (In re Tran),* 151 F.3d 339 (5th Cir. 1998) (lottery agent not a Section 523(a)(4) "fiduciary" under particular statutory scheme analyzed); *Van De Water v. Van De Water (In re Van De Water),* 180 B.R. 283 (Bankr. D.N.M. 1995) (attorney-in-fact held not to be Section 523(a)(4) "fiduciary" under circumstances analyzed); *Rech v. Burgess (In re Burgess),* 106 B.R. 612 (Bankr. D. Neb. 1989) (attorney-in-fact held to be Section 523(a)(4) "fiduciary" under circumstances analyzed). The Debtor's relationship with the Plaintiff falls within the latter category and will be analyzed below as such.

### b.     Embezzlement

"'Embezzlement', for the purposes of Section 523(a)(4), is defined by federal common law as the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *In re Rivera*, 217 B.R. at 385 (internal quotation marks omitted). "To prove embezzlement, the creditor must show by a preponderance of the evidence (1) that the debtor appropriated the subject funds for his own benefit and (2) that he did so with fraudulent intent or deceit." *Pierce v. Pyritz*, 200 B.R. 203, 205 (N.D. Ill. 1996). "Fraudulent intent may be determined from the facts and circumstances surrounding the act." *Estate of Stanford Harris v. Dawley (In re Dawley)*, 312 B.R. 765, 779 (Bankr. E.D. Pa. 2004), *cert. denied*, 2005 WL

2396489 (E.D. Pa. 2005) (internal quotation marks omitted).  "Embezzlement does not require the debtor to be acting in a fiduciary capacity."  *Id.*

### 3.    Effect of the State Court Judgment (Collateral Estoppel)

Only the bare State Court Judgment is in the record.[31]  Neither party attempted to have the State Court Complaint admitted as evidence nor did either party seek to have a transcript of the hearing in damages admitted into evidence.  As a result, the court has no basis to determine what issues were "necessary" to the State Court Judgment or even on what claim(s) it was rendered. Accordingly, the State Court Judgment cannot have a collateral estoppel (issue preclusion) effect in this adversary proceeding.  *See H.J. Bushka Lumber and Millwork v. Boucher (In re Boucher)*, 336 B.R. 27 (Bankr. D. Conn. 2005).  Therefore, the court will treat the State Court Judgment as the parties have: as irrelevant.

### B.    Application of Law To Fact

### 1.    Section 523(a)(2)

The Plaintiff has failed to prove any of the elements of "false pretenses" or "false representation."  The Plaintiff has failed to prove "actual fraud" for the same reasons (explained below) that he has failed to prove that the Debtor is a Section 523(a)(4) "fiduciary" or committed Section 523(a)(4) "embezzlement."

---

[31]       The Plaintiff marked a document purporting to be the State Court Complaint as "Exhibit F," but did not seek to have it admitted at the Trial.  The Debtor marked a document purporting to be the State Court Complaint as "Exhibit 4" and marked a document purporting to be a transcript of the subject hearing in damages as "Exhibit 5," but both parties ignored those documents at the Trial.

- 22 -

### 2.    Section 523(a)(4)

#### a.    Section 523(a)(4) "Fiduciary" Status

The court concludes that the Debtor was not a Section 523(a)(4) "fiduciary" with respect to either the ASB Account or the NDB Account.

### (1)    The ASB Account

The POA did not make the Debtor a Section 523(a)(4) "fiduciary" on this record.  For example (and as noted above), although the POA was general on its face, in fact it was intended to be used for only certain limited transactions.[32]  The POA was not issued for the sole benefit of the Plaintiff because, as discussed below, the Debtor had a broad authorization from the Plaintiff to use the ASB Account for her own benefit.  Moreover, the Plaintiff continued to play an active roll with respect to use of the ASB account after execution and delivery of the POA.  Those circumstances preclude a conclusion that a Section 523(a)(4) "fiduciary" relationship existed with respect to the ASB Account on a POA theory or any other theory.  *Cf. In re Van De Water, supra; In re Burgess, supra.*[33]

### (2)    The NDB Account

The court also concludes that the Debtor was not a Section 523(a)(4) "fiduciary" with respect to the NDB Account.  As noted above, many (if not substantially all) of the management decisions

---

[32]    Although the ASB Account fell within the contemplated transactions, the NDB Account did not.

[33]    It has been said that a Section 523(a)(4) "fiduciary" relationship may be found "when one party to a [state law] fiduciary relationship is incapable of monitoring the other's behavior." *In re Johnson,* 174 B.R. at 542.  However, here the Plaintiff could have monitored the Debtor's performance at any time with respect to the ASB Account or the NDB Account: all the Plaintiff had to do was request the Debtor to send the relevant statements on a contemporaneous basis.  For the reasons discussed in part II, *supra*, the Plaintiff chose not to do that.

with respect to the NDB Account were made by the Plaintiff. That retained control is inconsistent

with a Section 523(a)(4) "fiduciary" relationship with respect to the NDB Account. *Cf. In re Tran,*

*supra* (insufficient level of control over lottery proceeds to render lottery agent a Section 523(a)(4)

"fiduciary").[34] *Uwimana* (ambassador), *Andy Warhol* (attorney-client), *Bennett* (managing general

partner), *Picard* (corporate officer/director) and *Burgess* (power of attorney) all were based on a

much higher level of discretion and/or control by the debtor than is demonstrated here.

### b.  Embezzlement

### (1)  The ASB Account

It is uncontested that the balance of the ASB Account was entrusted by the Plaintiff to the

Debtor and that at least some of those funds were used by the Debtor for her own benefit. As to

those withdrawals, the sole issue is fraudulent intent. The court will analyze withdrawals before the

end of March, 2001 separately from withdrawals from and after April 1, 2001 (not including the final

withdrawal paid to the Plaintiff's parents).

---

[34]     The *Marchiando* [,13 F.3d 1111 (7th Cir. 1994,] analysis highlights
the central focus of the inquiry under § 523(a)(4) -- whether the
alleged fiduciary exercises actual control over the alleged
beneficiary's money or property. As we stated in *Bennett* [,989 F.2d
779 (5th Cir. 1993),], it is clear that the issue of control has always
been the critical fact looked to by the courts in imposing this high
level of responsibility. The [Texas Lottery] Act indisputably did not
grant Tran such control. Rather, the Act simply (1) authorized Tran
to sell lottery tickets, and (2) required her to remit net proceeds; it
never vested her with independent discretion to manage the state's
money.

*Tran*, 151 F.3d at 345 (internal quotation marks and footnote omitted).

### (A)      Pre-April 2001 Withdrawals

Based upon the frequent authorizations to use the ASB Account for the Debtor's benefit set forth in the Plaintiff's existing letters to her and the Debtor's testimony that further authorizations were given to her by other means, the court is persuaded that the Debtor was authorized to make the subject withdrawals or reasonably believed that her withdrawals from the ASB Account were authorized by the Plaintiff.  (*See* Debtor's Exh. 6; Debtor's Exh. 12; Debtor's Exh. 13; Debtor's Exh. 14; Debtor's Exh. 15; Debtor's Exh. 17; Plaintiff's Exh. CC; Plaintiff's Exh. HH; *see also* 6/23/05 Transcript at 176 (testimony of the Plaintiff).)[35]  That authorization and/or belief is inconsistent with fraudulent intent.

### (B)      Post March 30, 2001 Withdrawals

These withdrawals stand on a different footing from earlier withdrawals.  That is because the Debtor had broken off contact with the Plaintiff.  Whatever the Debtor's emotional and/or mental state during that period, she could not have reasonably believed that she still was authorized to

---

[35]      BY MR. SMALL:

Q.      Your complaint is based on the fact that she used the money for her own personal use, which is stated in Paragraph 8 of your complaint.  She spent the money for her own personal use, in violation of the statute.  But you - - correct?  That's the gist of your complaint?
A.      Correct.
Q.      But you authorized that personal use.
A.      Which one?
Q.      A multitude.  Not any one particular, but we just - - you've just testified there were a number of personal uses that you gave to her.
A.      Correct.
Q.      Authorization for personal use.
A.      Correct.

(*Id*. at 176:1-15 (testimony of the Plaintiff).)

- 25 -

invade the ASB Account for her own benefit when that authorization was based on a relationship

that was not active after the end of March, 2001.  The court draws an inference of fraud from the

foregoing.  Accordingly, the court concludes that the Debtor embezzled the following withdrawn

funds: 4/23/01 - $290.00; 8/9/01 - $118.00; 8/16/01 - $125.00; 8/20/01 - $125.00; 8/31/01 - $20.00;

9/20/01 - $100.00 (*see* Plaintiff's Exh. J), for a total of $778.00.

### (2)   The NDB Account

As with the ASB Account, the contested point is fraudulent intent (*i.e.*, lack of authorization

*vel non*).  The Plaintiff claims that he never authorized the Debtor to make withdrawals for her own

benefit from the NDB Account.  (*See* 6/23/05 Transcript at 177 (testimony of the Plaintiff).)[36]  The

letters from the Plaintiff in the record are of limited help in that regard because they end in March,

2000 which is before most of the withdrawals from the NDB Account were made.  However, the

Debtor claims that authorizations to use funds in the NDB Account for her own benefit were given

to her by the Plaintiff both verbally (and in later letters).  (*See also* 6/23/05 Transcript at 154

(testimony of the Debtor); 7/21/05 Transcript at 301-02[37] (testimony of the Debtor).)

---

[36]     There is evidence in the record contrary to the Plaintiff's position.  In at least three
letters, the Plaintiff authorized the Debtor to withdraw funds from the NDB Account:

- 6/8/99 Letter ("If you need a vacation feel free to sell Inta[system Corporation ("Inta")] and take one.)
- 6/11/99 Letter ("[T]ake the money from Inta and pay for your bed and the rest on the charge card.")
- 6/14/99 Letter ("Like I said take the money from Inta and pay off your debt please.")

(Debtor's Exh. 6.)

[37]     THE WITNESS [the Debtor]:   But the letters are only a partial of what occurred.
MR. MAY:   That's correct.
THE WITNESS [the Debtor]:   That's not the whole picture.

This is a classic case of "he said/she said." Both parties' testimony is self serving. There is

no corroboration of the Plaintiff's position in the record (although the court notes that the Plaintiff

labors under the disadvantage of having to prove a negative). On the other hand, authorization for

the Debtor's payment of "closing costs" has some support in the record in that the Plaintiff's

10/11/99 Letter (*see* Plaintiff's Exh. CC) to the Debtor urged her to buy a house[38] and the Plaintiff's

2/7/00 Letter (*see id.*) to the Debtor referred to funding a down payment for a house[39] (although on

a conditional basis).

The court is troubled by the fact that the Debtor has not meaningfully explained the three

October, 2000 withdrawals and the January 2, 2001 withdrawal from the NSB Account. However,

the Debtor stands accused here of embezzlement, not poor record keeping. On the issue of

fraudulent intent (*i.e.,* lack of authorization), the court is not persuaded by the testimony of either

party. Because the risk of nonpersuasion is on the Plaintiff, the issue must be decided against him.[40]

---

> MR. MAY:   That's correct.

(*Id.* at 301: 22 – 302: 1 (testimony of the Debtor).)

[38]     The 10/11/99 Letter stated: "I would really like for you to buy a house in the future. Spend your rent money on your own house. . . . You could afford a home." (Plaintiff's Exh. CC.)

[39]     The 2/7/00 Letter stated: "It would please me more than anything to get you enough money for a down payment on a house. I'd like you to realize at least one dream." (Plaintiff's Exh. CC.)

[40]     The Plaintiff complains that the Debtor refused to surrender the NDB Account and/or the Stock and/or its proceeds on demand. That does not constitute an embezzlement because the court is persuaded that the Debtor did not intend to retain the NDB Account permanently. (*See* 7/21/05 Transcript at 285 (testimony of the Debtor); 7/21/05 Transcript at 325-27 (testimony of Steven Mills).) *Cf. Fischer Inv. Capital, Inc. v. Cohen (In re Cohen)*, 334 B.R. 392, 400 n.7 (Bankr. N.D. Ill. 2005) (Intent to deprive creditor of his property permanently is a necessary element of embezzlement.). The Plaintiff also complains that the Debtor was incompetent in her handling of the NDB Account. If true, that might constitute a "defalcation" if the Debtor were a Section

IV.   __CONCLUSION__

For the reasons discussed above, the court concludes that the Debt is discharged except to the extent of $778.00.[41]   Judgment in accordance with the foregoing will enter.[42]

Dated: July 26, 2006                                              BY THE COURT


                                                    *Lorraine Murphy Weil*
                                                  **Lorraine Murphy Weil**
                                            **United States Bankruptcy Judge**

---

523(a)(4) "fiduciary." *Cf. Andy Warhol, supra.*  However, as explained above, the Debtor is not a Section 523(a)(4) "fiduciary" and such allegation is not relevant to a claim of embezzlement. (*See* part III.A.2.b, *supra*.)

[41]      The Debtor's discharge does not negate any obligation to turn the Stock, its proceeds and/or the NDB Account and the proceeds of the Third IRA over to the Plaintiff.

[42]      The Plaintiff's request for fees and expenses (other than statutory costs) is denied because it was not pleaded in the body of the Complaint as a claim for relief.  *See* Fed. R. Bankr. P. 7008(b); *Boucher*, 336 B.R. at 31 n.4.  The Plaintiff's request for an award of prejudgment interest and statutory costs will be granted. The Plaintiff shall file and serve on the Debtor's attorney an itemized application for statutory costs on or before August 11, 2006.  Objections to such application, if any, must be filed on or before August 21, 2006.